UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Yousef Ishaq Abuhekal,

        Plaintiff,

v.

United States Citizenship and
Immigration Services;
Alejandro Mayorkas, Director,
United States Citizenship and
Immigration Services; Sharon V.
Dooley, Director, St. Paul Field
Office, United States Citizenship
and Immigration Services;
Department of Homeland Security;
Janet Napolitano, Secretary,
Department of Homeland Security,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4687 ADM/TNL

_____

Michael H. Davis, Esq., Davis & Goldfarb PLLC, Minneapolis, MN on behalf of Plaintiff.

Katherine E. M. Goettel, Esq., Office of Immigration Litigation, U.S. Department of Justice, Washington, DC, and Lonnie F. Bryan, Esq., Assistant United States Attorney, Minneapolis, MN on behalf of Defendants.
_____

## I.  INTRODUCTION

Plaintiff Yousef Ishaq Abuhekal is a legal permanent resident who seeks to become a citizen of the United States.  Plaintiff has filed an action for de novo review of the decision of Defendant United States Citizenship and Immigration Services ("USCIS") denying his petition.  On May 3, 2011, the undersigned United States District Judge heard oral argument on Defendants' motion to dismiss or in the alternative for summary judgment [Docket No. 15].  For the following reasons, the motion for summary judgment is granted.

## II.  BACKGROUND[1]

Plaintiff became a lawful permanent resident of the United States on May 14, 1997. Abuhekal Aff. [Docket No. 22] ¶ 3.  About two months later, on July 15, 1997, he was convicted of assault under Minnesota Statutes § 609.224.  He was sentenced to probation and a fine of $190.00.  Defs.' Ex. A [Docket No. 17-1].  He was discharged from probation on June 24, 1998. Compl. [Docket No. 1] Ex. E.  Since this offense he has had no history of violence.  Abuhekal Aff. ¶ 23.

Sometime in 1999, Plaintiff started a business in Austin, Minnesota.  The business was not profitable and Plaintiff began to incur debts.  Abuhekal Aff. ¶¶ 6-7.

On October 9, 2000, Plaintiff possessed a false Social Security card.  Plaintiff states that he and his brother "were detained on charges related to the false social security cards.  My brother remained in detention pending deportation because his asylum application had been denied.  During that period, I was worried that my brother would be deported and persecuted." Id. ¶ 10.  Plaintiff pleaded guilty to the charge of possession a false Social Security card, in violation of 18 U.S.C. § 1028(a)(6) and (c)(1), and assisted law enforcement with further investigation.  Id. ¶ 11.  On March 15, 2004, Plaintiff was sentenced to three years' probation and community service.  Compl. Ex. E.  He served his sentence without incident and was discharged from federal probation on September 27, 2005.  Id.

On February 26, 2002, Plaintiff filed his first naturalization petition.  Defs.' Ex. B

---

[1] The facts are largely undisputed, and Plaintiff has indicated there is no further evidence to be presented.  On a motion for summary judgment, disputed facts are viewed in the light most favorable to the nonmoving party, in this case Plaintiff.  Nyari v. Napolitano, 562 F.3d 916, 920 (8th Cir. 2009).

[Docket No. 17-2]. In connection with that petition, Plaintiff was interviewed under oath on February 11, 2003. In the interview Plaintiff falsely claimed he had never used an alias. In part because of this false statement, his application was denied. Defs.' Ex. C [Docket No. 17-3]. Plaintiff explains the false statement was motivated by his fear that his brother would be deported, a situation he does not anticipate will recur in the future. Abuhekal Aff. ¶ 21.

Also in 2002, Plaintiff was audited by the State of Minnesota. The audit revealed Plaintiff had not paid income and sales taxes from 2000-2002 in the amount of $89,000. Id. ¶ 9. Plaintiff continued to file tax returns every year, and any refunds were applied to his tax obligation. Id. ¶ 16. He began negotiating with the State in November 2007; he attributes the intervening delay to (1) a mistaken belief that his accountant would assist him in negotiating a resolution, (2) the criminal prosecutions of himself and his brother related to the false Social Security cards, and (3) a lack of funds to pay any settlement. Id. ¶¶ 12-17. In October 2009, he and the State agreed to settle his tax liability for $15,000, an obligation he appears to have satisfied no later than December 2009, when the State released its tax lien. Id. ¶¶ 17-18; see also Compl. Ex. D.

Meanwhile, Plaintiff incurred credit card debt related to his unsuccessful business ventures. Id. ¶¶ 14-15. Between 2004 and 2007, four civil judgments totaling $59,000 were entered against Plaintiff in connection with this debt. Plaintiff's tax returns for this period reflect an adjusted gross income of $4,800 in 2004, $6,600 in 2005, $9,350 in 2006, $12,008 in 2007, and $12,000 in 2008.[2] Compl. Ex. E. Plaintiff rents his home. Id. He currently earns about

---

[2] Plaintiff has not provided tax returns for 2009 or 2010, which might offer a more complete picture of his current financial circumstances.

3

$900 per month working as a cashier, and has no bank account or credit cards. Abuhekal Aff. ¶ 19. He recognizes he "still owe[s] credit card debt" and states, "If I had the money, I would pay." He has received financial counseling and, as of the date of his affidavit, was contemplating filing for bankruptcy protection. Id. ¶ 20.

On June 5, 2008, Plaintiff filed his second naturalization petition, the one at issue in this case. USCIS interviewed him on September 18, 2009, and denied his petition on January 22, 2010 on the grounds that he had not shown good moral character for the preceding five years. Compl. Ex. C. Plaintiff timely requested de novo administrative review of that decision. Compl. Ex. B. A hearing was held on February 22, 2010, and on August 18, 2010, USCIS issued a final decision denying Plaintiff's petition on the grounds that he had failed to establish good moral character during the required period. Compl. Ex. A.

On November 22, 2010, Plaintiff filed the instant action, seeking de novo judicial review of the final decision of USCIS. Defendants now move to dismiss, or in the alternative, for summary judgment. Because both sides have submitted documents, and because Plaintiff has indicated he has no further evidence to be presented, the motion will be considered as one for summary judgment.

### III. DISCUSSION

**A.  Summary Judgment Standard**

The Federal Rules of Civil Procedure apply to citizenship proceedings. Fed. R. Civ. P. 81(a)(3). Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c));[3]

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)(same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(same). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

**B.    Good moral character**

An applicant for United States citizenship must comply with all statutory requirements. United States v. Ginsberg, 243 U.S. 472, 475 (1917). This includes the requirement that the applicant demonstrate good moral character for the "statutory period," which is the five years immediately preceding the filing of the naturalization petition. See 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1). Earlier conduct may also be considered if it is relevant or if the conduct within the statutory period reflects the applicant has not reformed his character. 8 U.S.C. § 1427(e); 8 C.F.R. § 316.10(a)(2). Good moral character is assessed on a case-by-case basis. 8 C.F.R. § 316.10(a)(2). Doubts are resolved against the applicant. United States v. Macintosh, 283 U.S. 605, 626 (1931), overruled in part on other grounds by Girouard v. United States, 328 U.S. 61, 69 (1946).

---

[3] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010; the summary judgment standard was previously located in Rule 56(c).

The Immigration and Naturalization Act does not define good moral character, but "quite explicitly states what it is *not*." United States v. Jean-Baptiste, 395 F.3d 1190, 1193 (11th Cir. 2005). The statute lists eight categories of persons who cannot establish good character as a matter of law, see 8 U.S.C. § 1101(f)(1)-(8), plus a catch-all category stating, "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f)(9). Pursuant to the authority granted by the statute, the USCIS has issued regulations setting forth additional categories of persons who cannot establish good moral character. See 8 C.F.R. § 316.10(b)(1)-(3). The regulations include another catch-all provision, providing:

> (3) Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant:
> . . .
> (iii) Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b)(1) or (2).

8 C.F.R. § 316.10(b)(3)(iii).

USCIS determined Plaintiff did not possess good moral character under this regulatory catch-all provision. The stated reasons are (1) Plaintiff's 2004 conviction for possessing a false Social Security card; (2) his failure to disclose his alias in his 2003 sworn interview with the USCIS; (3) the civil judgments and tax debts accrued against him; and (4) his 1997 conviction for assault.

**1. Plaintiff's 2004 conviction**

Plaintiff concedes he was convicted within the statutory period for an unlawful act – possession of a false Social Security card – which adversely reflects upon his moral character. He does not suggest there were any extenuating circumstances. Instead, he argues that Section

6

316.10(b)(3)(iii) be read to require that both the conviction for and the commission of the unlawful act take place within the statutory period. As the offense itself was committed outside the statutory period, Plaintiff argues the regulation ought not to preclude him from showing good moral character within the statutory period.

The Court does not agree. The regulation's text makes clear that an applicant "shall be found to lack good moral character if, *during the statutory period, the applicant . . . [c]ommitted* unlawful acts . . . *or was convicted* or imprisoned for such acts . . . ." 8 C.F.R. § 316.10(b)(3)(iii) (emphasis added). The word "or" means that the occurrence within the statutory period of any one of three events – commission, conviction, or imprisonment – triggers a finding that an applicant lacks good moral character. Following the plain meaning of this unambiguous language, other courts have found an applicant convicted within the statutory period is precluded from showing good moral character, no matter when the underlying crime took place. See Khamooshpour v. Holder, Civ. No. 10-1266, 2011 WL 662664, *6 n.1 (D. Ariz. Feb. 14. 2011) (unpublished) ("[I]t is enough to bar a finding of good moral character that the *conviction* occurred during the statutory period; the underlying crime itself does not have to have been committed during the statutory period."); see also Ni v. United States Citizenship & Immigration Services, Civ. No. 08-3883, 2009 WL 649156, *4 (C.D. Cal. March 9, 2009) (unpublished) (granting summary judgment for USCIS where applicant's conviction occurred within the statutory period).[4]

---

[4] The converse is also true. An applicant who committed the crime within the statutory period, but who was not convicted until after naturalization, is barred from showing good moral character. See United States v. Dang, 488 F.3d 1135, 1140-41 (9th Cir. 2007); Jean-Baptiste, 395 F.3d at 1196; United States v. Lekarczyk, 354 F. Supp. 2d 883, 888 (W.D. Wis. 2005).

Plaintiff argues this reading causes the regulation to exceed USCIS's statutory authority because it "contravenes Congress's intent of providing for reformation of character and undermines the statute's purpose of defining good moral character in terms of a person's conduct and acts." Pl. Mem. Opp. [Docket No. 20] at 7. Again, the Court does not agree.

When reviewing an agency's regulation a court must ask two questions: first, "whether Congress has directly spoken to the precise question at issue," and if not, "whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 843-44.

The Ninth and the Eleventh Circuits have had occasion to consider whether 8 C.F.R. § 316.10(b)(3)(iii) meets the Chevron test. Both have concluded that it does, and therefore does not exceed the authority granted by statute. See Dang, 488 F.3d at 1141; Jean-Baptiste, 395 F.3d at 1193-94. See also Etape v. Napolitano, 664 F. Supp. 2d 498, 507 n.5 (D. Md. 2009) (holding 8 C.F.R. § 316.10 entitled to Chevron deference); Lekarczyk, 354 F. Supp. 2d at 887-88 (same, for 8 C.F.R. § 316.10(b)(3)(iii)); DeLuca v. Ashcroft, 203 F. Supp. 2d 1276, 1279 (M.D. Ala. 2002) (same, for 8 C.F.R. § 316.10); Jiminez v. Eddy, 153 F. Supp. 2d 1105, 1107-08 (D. Alaska 2001) (same, for 8 C.F.R. § 316.10(c)).

The Court is persuaded by the reasoning in these cases. The catch-all provision of 8 U.S.C. § 1101(f) explicitly "invites the agency to expand the list of acts warranting adverse moral character determinations." Dang, 488 F.3d at 1141. Given the factors Congress has

outlined for consideration, the decision to include convictions occurring within the statutory period is neither arbitrary nor capricious, and does not contravene Congress's intent to allow an opportunity for character reform.

Elsewhere in the statutory section on good moral character, Congress has chosen to focus on the date of commission of a crime, rather than the date of conviction; Plaintiff argues these provisions support an inference that Congress intended the date of commission to control in all instances. See 8 U.S.C. § 1101(f)(3) (barring those convicted of drug trafficking offenses "if the offense . . . was committed during [the statutory] period"); § 1101(f)(5) (barring "one who has been convicted of two or more gambling offenses committed during such period"). Yet the statute also bars a finding of good moral character for "one who during such period has been confined, as a result of conviction, to a penal institution . . . regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period." 8 U.S.C. § 1101(f)(7). Rather than support an inference that Congress uniformly intended the date of commission of an offense to control, the statute's varying language suggests that Congress deliberately chose different triggering dates for different circumstances. To rely on the date of conviction does not contravene Congress's intent, as expressed in the plain text of the statute. The Court finds 8 C.F.R. § 316.10(b)(3)(iii) is not ultra vires and is entitled to Chevron deference.

### 2. Unresolved tax debts and civil judgments

Because Plaintiff's 2004 conviction alone bars a finding of good moral character on this particular naturalization application, consideration of additional conduct may not be necessary. However, as a matter of discretion, the Court will consider the effect of Plaintiff's tax debts,

which were not resolved until 2009, and the unpaid civil judgments entered against Plaintiff from 2004 - 2007.

Timely payment of taxes supports a finding of good moral character. See Iqbal v. Bryson, 604 F. Supp. 2d 822, 828 (E.D. Va. 2009). Conversely, failure to file or make timely payment of taxes may support a finding of a lack of good moral character. See, e.g., Azize v. Bureau of Citizenship & Immigration Servs., 594 F.3d 86, 90 (2d Cir. 2010); Gambino v. Pomeroy, 562 F. Supp. 974, 985 (D.N.J. 1982); Sebiko v. Chertoff, Civil No. H-08-2219, 2010 WL 2196271, *4 (S.D. Tex. 2010) (unpublished). Nonpayment of taxes is also a violation of Minnesota law, see Minn. Stat. § 289A.63 subd. 1(b), and therefore is an unlawful act subject to Section 316.10(b)(3)(iii).

Plaintiff was not charged or convicted of tax evasion. Nonetheless he has admitted he did not properly report income or pay $89,000 in taxes due from 2000 through 2002. Plaintiff did not begin to negotiate settlement of his tax debts until November 2007, and did not reach agreement until October 2009. His initial failure to pay falls outside the statutory period. He claims that his returns each year were applied to his tax liability. Yet it appears he did not begin to resolve his obligation to the State until November 2007, less than a year before he filed his naturalization petition. Because his failure to pay his taxes continued well into the statutory period, Section 316.10(b)(3)(iii) also bars a finding of good moral character for this application.

In evaluating the impact of Plaintiff's civil judgments as they relate to good moral character in considering a naturalization petition, a debt to a private party may be less significant than a debt to the state. See Puciaty v. U.S. Dep't of Justice, 125 F. Supp. 2d 1035, 1041 (D. Hawaii 2000). Both parties acknowledge that failure to pay a civil judgment, standing alone,

does not bar a finding of good moral character.  See In re Huymaier, 345 F. Supp. 339, 341 (E.D. Pa. 1972) (holding failure to remain current on child support payments did not preclude finding of good moral character); Puciaty, 125 F. Supp. 2d at 1041 (concluding failure to pay or expunge disputed debt of $3,106 did not preclude a finding of good moral character).  The test is the "standards of average citizens in the community in which the applicant resides."  Puciaty, 125 F. Supp. 2d at 1039.

Here, Plaintiff concedes he owes four civil judgments totaling $59,000 as a result of unpaid credit card debts.  He claims has not paid these debts due to financial hardship.  Financial hardship, if proven, is relevant to the question of whether failure to pay debts reflects on Plaintiff's good moral character.  See Huymaier, 345 F. Supp. at 341 (finding a father supporting family of six, who was obliged to pay daughter's "extensive medical bills" as well as child support on a "gross salary of less than $8,000 per year," did not lack good moral character.)

Plaintiff has testified that he earns about $900 per month, and no longer has a bank account or credit cards.  He rents his home and there is no evidence he has assets which might be used to satisfy a civil judgment.  There is no evidence his creditors have attempted to enforce the judgments.  Although Plaintiff's financial picture appears to be improving, his annual income has fallen consistently below 125% of the poverty guidelines established by the U.S. Department of Health and Human Services; in some years, it has been considerably lower.[5]

---

[5] Pursuant to 42 U.S.C. § 9902(2), the Secretary of the Department of Health and Human Services annually updates the poverty guidelines.  The guidelines are used as an eligibility criterion for certain federal means-tested benefits.  See http://aspe.hhs.gov/poverty (last visited June 27, 2011); Department of Health and Human Services, Annual Update of the HHS Poverty Guidelines, 69 Fed. Reg. 7336 (Feb. 13, 2004); 70 Fed. Reg. 8373-02 (Feb. 18, 2005); 71 Fed. Reg. 3848-01 (Jan. 24, 2006); 72 Fed. Reg. 3147-01 (Jan. 24, 2007); 73 Fed. Reg. 3971-01 (Jan. 23, 2008).

As Plaintiff's current income remains at about $900 per month (or $10,800 annually), his failure to pay the civil judgments does not reflect adversely on his moral character. Should his financial situation improve,[6] it may be viewed in a different light.

### 3. Conduct outside the statutory period (before June 5, 2003)

Conduct "at any time prior" to the statutory period may be taken into consideration "if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period or if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character." 8 C.F.R. § 316.10(a)(2). However, "an applicant's conduct prior to the statutory period is relevant only to the extent that it reflects on his or her moral character within the statutory period." Nyari, 562 F.3d at 920.

USCIS found Plaintiff had not established good moral character in part due to his conviction for domestic assault in 1997, as well as his failure to disclose use of an alias in a February 2003 sworn interview in connection with his prior application for naturalization. Upon de novo consideration of the record, the Court finds that neither event is relevant to a finding of good moral character.

Plaintiff's assault conviction is nearly fourteen years old. The record reflects no subsequent incidents of violence, and there is no evidence whatsoever of any violent behavior by Plaintiff within the statutory period. Accordingly, the 1997 assault conviction is not relevant to a finding of good moral character.

A closer question is presented by the 2003 false statement under oath, which is also a crime. See 18 U.S.C. § 1015(a). Had this conduct occurred within the statutory period, it alone

---

[6] It appears from the record Plaintiff paid $15,000 in November 2009 to resolve his unpaid taxes. Compl. Ex. D.

would bar a finding of good moral character.  See 8 U.S.C. § 1101(f)(6); 8 C.F.R. § 316.10(b)(2)(iv).  However, Plaintiff waited more than five years to file his next naturalization application.  The record reflects no false statements in the interim; to the contrary, it appears that during this same period Plaintiff filed annual tax returns, accepted responsibility for his federal offense, assisted law enforcement, and settled his tax obligations with the State of Minnesota.  There is no evidence of any false statement in connection with Plaintiff's current naturalization application or at any time within the statutory period.

The Court does not condone the conduct underlying Plaintiff's assault conviction, nor the making of false statements under oath.  However, there has been no recurrence of similar behavior during the statutory period.  Viewed in the totality of the circumstances, Plaintiff's 2003 conduct is not relevant to his good moral character.

Plaintiff's efforts to remain gainfully employed, to pay taxes, to resolve his outstanding tax debts and to become a citizen of the United States are commendable.  However, a de novo review of his application filed in June 5, 2008, makes clear that as of that date, he was not eligible for naturalization as a matter of law.  Defendants are entitled to summary judgment.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion [Docket No. 15] is **GRANTED. LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


     s/Ann D. Montgomery  
ANN D. MONTGOMERY  
U.S. DISTRICT JUDGE

Dated:  June 30, 2011.